# JOHN W. SCHLESSINGER, et al. v. WILLIAM ROSENHEIM, et al.

Eastern Section.  May 22, 1926.

No petition for Certiorari was filed.

1. **Landlord and tenant.  Long time tenant in possession under lease which provides for it keeping the building in repair is alone liable for damages cause by its failure to keep building in repair.**

   In an action to recover damages caused by water being dumped on complainant's roof from an adjoining building brought against the tenant and the landlord jointly, held that the tenant being in possession of the building under a lease providing that it should keep the building in repair was alone liable for the damages and there was no liability on the part of the landlord.

2. **Adjoining landowners.  The owner of an adjoining building is liable for damages caused by water being drained on to an adjoining building.**

   In an action to recover for damages caused from water which was drained from defendant's roof on to plaintiff's roof, held that defendant was liable for the damages.

3. **Adjoining landowners.  Adjoining landowner is not liable for damages caused by water drained from the roof of his building until notice is given.**

   In an action to recover damages caused by water being drained on to the roof of plaintiff's building from defendant's building, held that there was no liability on defendant for any damages caused prior to notice being given to it.

4. **Adjoining landowners.  No defense that part of water drained on to plaintiff's building came from another building.**

   In an action to recover damages caused by water wrongfully drained on to a building from the building of defendant, held that it was no defense that a part of the water had wrongfully been drained onto defendant's building from another building and thence ran on to roof of plaintiff.

Appeal from Chancery Court, Hamilton County; Hon. W. B. Garvin, Chancellor.

Affirmed.

Sizer, Chambliss & Chambliss, and Joe V. Williams, all of Chattanooga, for appellant.

Miller, Miller & Martin and W. E. Wilkerson, all of Chattanooga, for appellee.

THOMPSON, J.  Market street and Broad street, in Chattanooga, are parallel streets, Broad being the next street west of Market.

The complainant, Schlessinger, on August 10, 1922, acquired a lease of a building extending from Market to Board, and the Walk-Over Shoe Company, a corporation with which he was connected and for whose benefit he had leased the building, began occupying it as a retail shoe store on or about the first of November, 1922.

This building is spoken of in the record as the Walk-Over building, and as No. 723 Market street.

The building immediately north of and adjoining it also extended through from Market to Broad. It is spoken of in the record as the Alcazar building, and as No. 721 Market street. It was in the possession of the defendant Tennessee Enterprises, Inc., a corporation of which Mr. W. E. Wilkerson was president and directing head, under a long term lease. The defendants, William Rosenheim and wife, Belle Lob Rosenheim, were the owners of the reversionary interest in this building, having bought it subject to the lease on July 12, 1919.

The building just north of and adjoining this Alcazar or No. 721 Market street building also extended through from Market to Broad. It was occupied by the Piggly-Wiggly Company, and is spoken of in the record as the Piggly-Wiggly building.

A part of the roof of the Piggly-Wiggly building was higher than a part of the roof of the Alcazar or No. 721 Market street building, and a part of the roof of the Alcazar or No. 721 Market street building was higher than a part of the roof of the Walk-Over or No. 723 Market street building.

On December 22, 1922, during a hard rain, water accumulated on the roof of the Walk-Over or No. 723 Market street building in such a large and excessive volume that it went through the roof and damaged some of the stock of goods, fixtures, decorations, etc., of the Walk-Over Shoe Company.

In a day or two thereafter the Walk-Over Shoe Company, through its attorney, Mr. Joe V. Williams, notified the defendants, Tennessee Enterprises, Inc., and Mr. and Mrs. Rosenheim of the damage, and that the accumulation of the large and excessive volume of water on the roof over its store was due to the fact that rain water falling on the roof of the Alcazar or No. 721 Market street building was diverted onto the roof of the Walk-Over or No. 723 Market street building. At the time this notice was given, Mr. and Mrs. Rosenheim were in Baltimore, Maryland, where Mr. Rosenheim was confined to a hospital. But their son called upon Mr. Wilkerson, president of the Tennessee Enterprises, Inc., and got the impression that that company would handle the matter and remedy the defect if any existed in the roof of the Alcazar or No. 721 Market street building. Upon the return of Mr. and Mrs. Rosenheim to Chattanooga about the first of January, 1923, they called upon Mr. Williams and showed him copies of the leases under which the Tennessee Enterprises, Inc., was in possession of the Alcazar or No. 721 Market street building, and were told by Mr. Williams that he doubted whether the Walk-Over Shoe Company could hold them (Mr. and Mrs. Rosenheim) liable. From Mr. Williams' office, they

went to Mr. Wilkerson's office. They testified that Mr. Wilkerson told them that the Tennessee Enterprises, Inc., would handle the matter and would remedy whatever if any defect existed. Mr. Wilkerson, upon the other hand, testified that he told them merely that the Tennessee Enterprises, Inc., would do whatever its leases required with reference to remedying defects in the roof.

On June 25, 1923, during another hard rain, water again accumulated in a large and excessive volume on the roof of the Walk-Over or No. 723 Market street building and went through and damaged some of the stock of goods, fixtures, ornaments, etc., of the Walk-Over Shoe Company.

On August 9, 1923, the complainants, Mr. Schlessinger and Walk-Over Shoe Company, filed the bill in this cause against the defendants, Mr. and Mrs. Rosenheim and the Tennessee Enterprises, Inc., seeking the issuance if a mandatory injunction commanding the defendants to remove a down spout or pipe alleged to be so constructed and maintained by them as to throw water from the roof of their building onto the roof of complainants' building, and enjoining defendants from causing or permitting water falling on the roof of their building from being thrown onto the roof of complainants' building. The bill also sought to recover damages sustained in the two overflows of December 22, 1922, and June 25, 1923.

The Chancellor held that complainants were entitled to the mandatory injunction. The same was issued, and the down spout or pipe complained of was removed by the defendant, Tennessee Enterprises, Inc., and on final hearing the injunction was made perpetual. The Chancellor also decreed that since no notice was given of any alleged defects or nuisance prior to the first overflow, there could be no recovery for the damages sustained by that overflow. There was no appeal from this feature of the case and it will be unnecessary to notice it further. The Chancellor further decreed that the Tennessee Enterprises, Inc., was liable to the Walk-Over Shoe Company for the sum of $823.93, with $88.58 interest from August 9, 1923, the date of the filing of the original bill, a total of $912.51, the same being the total damages sustained from the second overflow, i. e. on June 25, 1923. But no recovery was allowed against Mr. and Mrs. Rosenheim.

From this decree the Tennessee Enterprises, Inc., alone has appealed to this court and assigned errors making two questions; First, that under the law and the facts as disclosed by the record it was not liable to the Walk-Over Shoe Company for the damages sustained by it as a result of the second overflow; Second, that even if it was liable for some of these damages, it was not liable for the full amount sustained, and was only liable for the part that was caused by the rain water which had fallen on its own building. This,

upon the theory that a part of the water which caused the damage had fallen on the roof of the Piggly-Wiggly building and from there had been thrown onto defendant's building, and then onto complainants' building, and the defendant and the owner of the Piggly-Wiggly were not joint tort feasors; citing Swain v. Tenn. Copper Co., 111 Tenn., 430; Gay v. State, 90 Tenn., 646; Chipman v. Palmer, 77 N. Y., 51; Miller v. Highland Ditch Co., 87 Calif., 430.

As to the first assignment of error; we think the Chancellor was correct in holding the Tennessee Enterprises, Inc., liable to the Walk-Over Shoe Company for the amount of damages sustained as a result of the second overflow.

The Tennessee Enterprises, Inc., was in actual physical possession of the Alcazar or No. 721 Market street building, under the terms of a long term lease which provided that it should keep the building, roof, etc., in repair, Mr. and Mrs. Rosenheim owning only the reversionary interest, and we think the duty was upon it not to so maintain the building as to wrongfully and unlawfully damage the building next to it or the occupants thereof.

The record shows that a down spout or pipe was on and attached to the Alcazar building, and that this down spout carried and emptied the water falling on a considerable portion of the roof of the Alcazar building onto the roof of the Walk-Over building at the place where the water broke through and caused the damage. There was an opening in the roof of the Walk-Over building into which the water falling on this portion of its roof ran, and a four-inch pipe carried the water from this opening to the sewer. The record shows that this pipe was sufficient to take care of all the water falling on that part of the Walk-Over building which it drained; and it may possibly have been sufficient to also carry the rain water which actually fell on a portion of the Alcazar building and was carried onto the roof of the Walk-Over building by the down spout above mentioned, although we have doubts as to the truth of this last statement.

The Tennessee Enterprises, Inc., defended upon the theory that originally the down spout above mentioned had been connected with the opening above mentioned, as a part of the drainage of the two buildings, which had probably been constructed as one building, and that a predecessor in lease of complainant had disconnected the down spout from the opening while a new roof was being put on a part of the Walk-Over building, and had left the down spout emptying onto the roof instead of into the opening and that on account of this the pipe leading from the opening to the sewer had become clogged so that the water could not run through—thus causing the accumulation of water on the roof of the Walk-Over building. But the only proof which it introduced was that the new

roof had been put on, and that the pipe leading from the opening to the sewer was clogged at the time of the overflow. It did not prove that the down spout had ever been connected with the opening, or that complainant's predecessor in lease had disconnected it at the time it was putting on the new roof.

Just how the down spout got there does not appear, but the Tennessee Enterprises, Inc., did not put it there. It may have been a part of the original drainage system, and it may have been disconnected as defendant insists; or, it may have been put there by some predecessor of defendant. How this was the record does not show. But it was there at the time of both overflows, and it carried water falling on a considerable portion of the roof of the Alcazar building and emptied it onto the roof of the Walk-Over building near the opening and at the place where it broke through and caused the damage. And there is no evidence showing that the defendants or any of their predecessors in lease or title were ever granted or given the right to maintain it, or that they acquired such right by prescription. And although complainant notified defendant immediately after the first overflow that it was diverting water onto complainant's roof, the defendant did not take down the down spout until ordered to do so by the court.

It seems to us that after the first overflow when it was discovered that the down spout was there and was diverting and carrying water from defendants' roof to complainant's roof, and when complainant so notified defendant and advised it that complainant was being damaged, it became defendants' duty to remove the down spout regardless of the fact that defendant itself had not put it there. This, because the down spout was on its building, was under its control, and defendant was unable to establish a legal right to maintain it.

One witness for defendant (a plumber) testified that at the time of the second overflow the pipe leading from the opening in complainant's roof to the sewer was stopped up with a piece of broom stick, some pieces of brick and some gravel. It also appears that a pipe which drained water from the roof of the Piggly-Wiggly building was stopped up and caused rain water falling on the roof of that building to run onto defendant's roof and unite with the rain water falling thereon before the whole ran onto complainant's roof.

But a witness for the complainant testified that water was running through the pipe from the opening to the sewer, and the proof as a whole establishes the fact that the real cause of the overflow was that while this pipe was large enough to carry all water falling on that part of complainant's roof which it drained, yet it was not large enough to also carry all of the water which was being diverted

from defendant's roof onto complainant's roof, especially when water was being diverted from the Piggly-Wiggly roof onto defendant's roof, and was uniting with the water falling on defendant's roof and the whole was then running onto complainant's roof. In regard to this pipe being stopped up, the Chancellor (on the assumption that it really was) stated as follows:

"It does not appear from the evidence where the said debris came from, whether from complainant's roof or defendant's roof or elsewhere. Complainant's roof was a comparatively new one, and the evidence shows that in laying a gravel roof, loose gravel is sometimes left upon it. But complainant's new roof had had at least one thorough washing, to-wit: on the occasion of the downpour in December, 1922, and there is no evidence that gravel got into the complainant's pipe on that occasion, but that the damage was wholly caused by the fact that it was of insufficient size to carry off the excess of water from defendant's downspout. On the other hand, the proof is that defendant's roof was an old roof, and that gravel roofs tend to disintergate with age and the gravel become loose and subject to be washed off. Regardless of where the said debris came from, it does not appear that it would have been carried into the complainant's pipe unaided by the excess water which was cast upon its roof from the defendant's roof."

In other words, the Chancellor expressed the opinion that if the pipe in fact was stopped up, it was because of the wrongful diversion of water onto complainant's roof, and did not constitute a ground of defense to complainant's right to recover. In this we fully concur.

Even if the pipe had been stopped up, and even if the defendant's had not been responsible for causing it to stop up, it nevertheless does not appear likely that enough water would have accumulated to cause the damage complained of had defendant not been wrongfully diverting water from its roof onto complainant's roof.

We think the wrongful diversion of the water from defendant's roof to complainant's roof caused the damage and fixed liability upon defendant, and that this is true regardless of the fact that the water falling on the Piggly-Wiggly roof may have been wrongfully diverted onto defendant's roof. Complainant was in no sense responsible for the diversion of water from the Piggly-Wiggly roof onto defendant's roof, and the fact that this diversion was taking place and was wrongful, did not justify the defendant in diverting the water from its roof onto complainant's roof.

As stated, we are of opinion that the Chancellor was correct in fixing liability on the defendant Tennessee Enterprises, Inc., and the first assignment of error is, therefore, overruled.

It seems to us that what has been said also disposes of the question raised by the second assignment of error. We do not think that the principles underlying the case of Swain v. Tenn. Copper Company, 111 Tenn., 430, and the other cases cited by defendant, are at all applicable to the facts of this case, and the second assignment will therefore be overruled. The decree of the lower court will, therefore, be affirmed with costs.

Portrum and Snodgrass, JJ., concur.